**AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

I, Drew Hatch, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn according to law, hereby state that the facts stated in the following affidavit are true and correct to the best of my knowledge, information, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the DEA, United States Department of Justice, and as such I am empowered under Title 21, United States Code, § 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I have been employed with DEA since June of 2018. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act. During my time with DEA, I have participated in numerous drug investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code. I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

2. I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am authorized by law to conduct investigations and make arrests for offenses enumerated in the United States Code. I am a "Federal Law Enforcement officer" within the meaning of Fed.R.Crim.P. 41(a)(2)(C).

**INVESTIGATION**

1. Based on the facts set forth herein, there is probable cause to believe that on or about December 5, 2019, in the State and District of Colorado, the Defendant, **IRMA ZAMORANO**, did knowingly possess with the intent to distribute a controlled substance, specifically 500 grams or more

of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

2. This investigation is in relation to a December 5, 2019 traffic stop by Colorado State Patrol Trooper Matthew T. Bowman (#0990). That vehicle was occupied by several passengers including the defendant, **IRMA ZAMORANO**, and, during a subsequent search of the vehicle, discovered approximately 40.7 pounds of methamphetamine. Trooper Bowman then contacted DEA to request assistance in furtherance of this investigation. Accordingly, the information contained within this affidavit is based on my training and experience, my personal observations, my participation in the investigation described herein, and information imparted to me by other law enforcement officers involved in this investigation, including information received from Colorado State Patrol Trooper Matthew T. Bowman described below.

3. This affidavit is submitted for the limited purpose of securing an arrest warrant. As such, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth facts that I believe are necessary to establish probable cause to believe that the Defendant, **IRMA ZAMORANO**, violated Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii).

4. On December 5, 2019, agents of the Drug Enforcement Administration (DEA) Enforcement Group 1 (EG1) were notified that the Colorado State Patrol (CSP) had received an anonymous tip about a vehicle traveling from California to Minnesota that was carrying narcotics. Later in the evening agents spoke with CSP Trooper Matthew Bowman and received the following information from him:

5. On December 5, 2019, Trooper Bowman was on duty working interdiction efforts in Logan County, State of Colorado. At approximately 12:58 p.m., Trooper Bowman received

information from another officer regarding an anonymous tip regarding a vehicle allegedly transporting illegal narcotics from California to Minnesota. The anonymous caller provided information which included a California plate of 6ROZ304 and the caller provided the names of "Irma Zamorano," "Anna Zamorano," "Omar Perez," and "Oscar Jesus Zamorano" . The caller also stated there were children present in the vehicle.

6. At the time of the anonymous tip, the caller related the vehicle was currently traveling through Colorado. Trooper Bowman ran a records check on the license plate provided and found it came back registered to a 2011 Dodge Durango VIN: 1D4SD5GT0BC681811, registered to Omar Perez Lemus at 1105 Overland Road, Los Banos, CA 93635. Trooper Bowman also ran further records checks on this vehicle and learned the current owner had recently purchased the vehicle on May 25, 2019 and since that time the vehicle had accrued approximately 17,714 miles (Trooper Bowman stated that the industry average for mileage accrued on motor vehicles per year according to CarFax is 15,000 miles, this number of miles in only 6 months is far above average). Trooper Bowman also ran the license plate through an automatic license plate reader (ALPR) system and learned this vehicle was spotted traveling eastbound on I-70 near Clifton, CO earlier on this day at approximately 11:05 a.m.

7. At approximately 4:19 p.m., Trooper Bowman spotted the aforementioned Durango. Trooper Bowman was stationary in his patrol vehicle, in an emergency vehicle turnaround on I-76 at approximate milepost 111 in Logan County, State of Colorado, and observed this vehicle pass by traveling eastbound on I-76. As the Durango passed his location, Trooper Bowman observed the CA plate attached to the front of the vehicle was obstructed; at this time the plate appeared to be either excessively dirty or possibly affixed with a tinted license plate cover as the plate was not legible as the vehicle passed his location. Based on my training and experience, I know that obstructed license plates are often used by individuals involved in drug trafficking activities to conceal unusual travel

patterns, in an attempt to defeat automatic license plate reader (ALPR) systems utilized by law enforcement.

8. Shortly after the vehicle passed Trooper Bowman's location, Trooper Bowman observed the Durango change lanes from the left lane to the right lane in front of a tractor trailer, which was traveling in the right lane. When the Durango changed lanes to the right lane in front of the tractor trailer, Trooper Bowman observed there was only approximately 1 ½ car lengths between the Durango and tractor trailer during and after the lane change. Trooper Bowman stated it forced the tractor trailer to follow at a hazardously close distance of only approximately 1 second or less of time distance. Further, Trooper Bowman stated that this following distance would not have allowed the driver of the tractor trailer to react, apply braking systems and avoid a collision if the driver of the Durango were to suddenly and rapidly decrease its speed.

9. After observing the aforementioned violations, Trooper Bowman pulled out of the emergency turnaround and began traveling eastbound on I-76. Trooper Bowman eventually caught up to the Durango which was still traveling in the right lane of the roadway. While traveling in the left lane, Trooper Bowman pulled up beside the Durango and at this time, Trooper Bowman observed the male driver take a drink out of a beverage container, Trooper Bowman saw the driver scratch his nose and Trooper Bowman noted the driver stared straight ahead and never looked over at his patrol vehicle. Trooper Bowman initiated a traffic stop with this vehicle by activating his marked patrol vehicle's emergency lights at approximately 4:22 p.m. for violation of C.R.S. 42-3-202(2)(a) Vehicle Number Plates Not Clearly Legible/Visible and C.R.S. 42-4-1007(1)(a) Changed Lanes When Unsafe; the driver of the Durango yielded and pulled over onto the right shoulder of the roadway near milepost 115. After the Durango came to a stop, Trooper Bowman noticed the Durango also had a rear license plate cover which was partially obstructing the state "California" on the rear license plate.

10. Trooper Bowman approached the Durango on the passenger side and made contact with four adult occupants and two juveniles. The male driver was later identified by CA driver's license as a person hereing identified by the initials O.P.L. The male front seat passenger was later identified as a male with the initial M.R., the female back seat passenger in the middle row seat was later identified by CA driver's license as a female herein identified as A.Z., and the female in the far back seat of the vehicle was later identified by Mexico ID card as the defendant, **Irma Lucero ZAMORANO**, DOB 12/24/71.

11. Upon contact, Trooper Bowman explained to O.P.L. the reason for the traffic stop and requested his driver's license and vehicle documents. Trooper Bowman also noticed the passenger of the vehicle, M.R., stared straight ahead, and Trooper Bowman stated M.R. appeared very concerned and worried. After receiving the requested paperwork, Trooper Bowman requested for O.P.L. to accompany him inside of his patrol vehicle as Trooper Bowman routinely does during traffic stops while completing administrative functions related to the traffic stop.

12. O.P.L. consented to Trooper Bowman's request and accompanied him in his patrol vehicle and sat in the front passenger seat. While completing administrative functions related to the traffic stop, Trooper Bowman engaged O.P.L. in conversation. During this conversation with O.P.L., he related the following:

   a. He and the other occupants in the vehicle were traveling from California to Minnesota. Trooper Bowman stated that O.P.L. did not know what city they were traveling to, only that they were traveling to Minnesota to visit his mother in law's (**ZAMORANO**'s) family; O.P.L. provided this information unsolicited after Trooper Bowman had asked him if they were currently traveling from home, Trooper Bowman also noted that as O.P.L. provided this information, he pointed towards the east with his fingers.

    b. O.P.L. related they were going to stay in Minnesota for about a month and were going there for the New Year's holiday, he related he got a month off from work and that he works in construction and related they are driving "straight through" to Minnesota.

    c. O.P.L. related that **ZAMORANO** is his mother in law, A.Z. is his wife, the children are his, and the male passenger in the front seat (M.R.) is **ZAMORANO**'S boyfriend, but O.P.L. did not know this male's first or last name.

13. While conversing with O.P.L., Trooper Bowman observed he was extremely nervous; Trooper Bowman observed Perez Lemus's pulse rate was extremely rapid, which Trooper Bowman could observe at the bottom of the front of his neck. Further, Trooper Bowman stated O.P.L. was breathing very heavily and on multiple occasions O.P.L. would belt out in laughter at unusual times that did not warrant such laughter.

14. Following his conversation with O.P.L., Trooper Bowman again approached the Durango on the passenger side. While completing a written warning form related to the reason for the traffic stop, Trooper Bowman conversed with the other occupants. Though the passengers related they could not speak English, **ZAMORANO** stated they were traveling to the Minneapolis area of Minnesota. A.Z. stated they were traveling there to visit her cousin and that they were only going to stay there 5 days.

15. Trooper Bowman then returned to his patrol vehicle and again spoke with O.P.L. Trooper Bowman returned O.P.L.'s documents back to him. Trooper Bowman then asked O.P.L. if Trooper Bowman could speak with him further and O.P.L. agreed. Trooper Bowman asked O.P.L. if there was anything illegal in the car and Trooper Bowman asked O.P.L. about specific types of contraband. O.P.L. denied knowledge of any contraband being present inside of the vehicle. Trooper Bowman asked O.P.L. for consent to search the vehicle, which O.P.L. refused.

16.    At this point in the contact, Trooper Bowman strongly suspected O.P.L. and the other occupants were involved in criminal activity based on several factors, the most notable factors listed below:

    a. Information from the anonymous tip; the information provided by the anonymous caller was specific to the vehicle and the occupants, and much of the information provided by the tipster was corroborated during the course of the traffic stop, including the vehicle and license plate number, as well as the identities of the passengers.

    b. Trooper Bowman's observation that the vehicle had accrued a substantial number of miles in a short period of time. Based on my training and experience, I know that vehicles being utilized for the purpose of trafficking illegal narcotics are often used for multiple long distance trips in short periods of time causing a quick accumulation of substantial miles.

    c. Trooper Bowman's observation of O.P.L.'s extreme nervousness as compared to the innocent motoring public Trooper Bowman comes into contact with every day while on patrol; O.P.L.'s extreme level of anxiety was beyond what is typically expected from a driver of a motor vehicle stopped for minor traffic violations. Further, O.P.L.'s anxiety remained constant and did not subside over the course of the traffic stop, and heightened after Trooper Bowman asked questions about contraband in the vehicle and after asking for consent to search. O.P.L. had a valid driver's license, was advised he was receiving a warning for the traffic violations and did not have any outstanding warrants or any criminal record.

    d. The male front seat passenger, M.R., appeared unusually anxious. Based on Trooper Bowman's training and experience, it is very unusual for passengers in a motor vehicle stopped for a traffic violation to be excessively nervous during a routine traffic stop,

and is often associated to other ongoing criminal activity not related to the reason for the traffic stop itself.

e. O.P.L.'s inability to provide any information about the male front seat passenger (M.R.), though he claimed this individual was his mother in law's boyfriend. Based on Trooper Bowman's training and experience, Trooper Bowman found this to be very unusual and suspicious, based on his training and experience. I know, based on my training and experience, that individuals that are involved in criminal activity, specifically the crimes of drug trafficking and human smuggling often do not have any prior relation to other individuals in their vehicle and often first meet these individuals prior to their cross country trip. In relation to drug trafficking, often another member of the drug trafficking organization is tasked with "watching over" the load of narcotics to ensure the trip is successful without law enforcement intervention and in relation to human smuggling, the individual is often picked up just before the trip commences to be transported from one location to another; this observation is highly indicative of tradecraft associated with these two types of crimes specifically.

f. Trooper Bowman noted that there were large discrepancies between O.P.L.'s and A.Z.'s statements regarding the expected length of their trip; while O.P.L. claimed they would stay until the new year, A.Z. claimed they would only stay for 5 days.

17. Shortly after Trooper Bowman initiated the traffic stop, Colorado State Patrol Trooper N. McDowell arrived on scene. Based on the information Trooper Bowman observed and obtained in the course of the traffic stop, Trooper Bowman requested that Trooper McDowell deploy his K-9 on the Durango for a free air sniff. Trooper McDowell and K-9 Buck are currently certified by Utah POST and the Colorado Police Canine Association (CPCA) in drug detection. K-9 Buck is a single purpose narcotic detector canine and is certified in detecting the odors of methamphetamine, heroin and cocaine. K-9 Buck is not trained to alert to the odor of marijuana.

18.     The other occupants were removed from the Durango and Trooper McDowell deployed K-9 Buck on the Durango for a free air sniff. K-9 Buck gave a positive alert to the odor of illegal narcotics being present within the Durango.

19.     Following the K-9 alert, and in light of the other information obtained and observed during the stop, Troopers Bowman and McDowell conducted a search of the Durango. During the search, they discovered 35 plastic heat sealed plastic bags containing an off-white crystalline substance consistent with methamphetamine, which were located concealed inside of a large suitcase and black duffel back in the rear seat area of the Durango. In total, the 35 bags of suspected methamphetamine had a gross weight of **40.7 pounds**.

20.     At approximately 10:39 p.m., Trooper McDowell tested a sample of the suspected methamphetamine located in the vehicle utilizing a field narcotic identification kit resulting in a presumptive **positive** result for the presence of **methamphetamine**.

21.     After locating the contraband, **ZAMORANO** was interviewed over the phone by Colorado State Patrol Trooper Eduardo Henriquez of the Colorado State Patrol Troop 2B Colorado Springs office. Trooper Henriquez is bilingual in English and Spanish.

22.     Trooper Henriquez advised **ZAMORANO** of her *Miranda* Rights and interviewed **ZAMORANO** in Spanish, which she waived and agreed to talk with Trooper Henriquez. After interviewing **ZAMORANO**, Trooper Henriquez advised Trooper Bowman that ZAMORANO had provided a full confession and claimed possession and knowledge of the suspected methamphetamine located in the Durango.

23.     Specifically, **ZAMORANO** detailed how she obtained the narcotics, how the narcotics were situated in the vehicle, and the logistics involved with her transporting the narcotics to Minnesota. **ZAMORANO** related she was being paid $10,000 to transport the narcotics from California to Minnesota and claimed the other occupants in the vehicle did not have any knowledge of the crime.

## CONCLUSION

24. Based on the foregoing, there is probable cause to believe that on or about August 5, 2019, in the State and District of Colorado, the Defendant, **IRMA ZAMORANO**, did knowingly possess with the intent to distribute a Schedule II Controlled Substance, specifically the approx. 40.7 pounds (gross) of methamphetamine as described herein, in violation of Title 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

25. I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Respectfully submitted,

*s/ Drew P. Hatch*
Drew P. Hatch
Special Agent
Drug Enforcement Administration

Sworn to before me and submitted, attested to, and acknowledged by electronic means this ___6th___ day of December, 2019.

_____
THE HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Application and affidavit reviewed and submitted by Bradley W. Giles, Assistant United States Attorney.**